# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**JOSEPH VERHEST,**

          Plaintiff,

vs.                                     **No. CIV 09-663 MCA/LFG**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

          Defendant.

## MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION[1]

    **THIS MATTER** is before the Court on Plaintiff Joseph Verhest's ("Verhest") Motion to Reverse and Remand for a Rehearing, filed November 24, 2009. [Doc. 15.] The Commissioner of Social Security issued a final decision denying benefits, finding that Verhest was not entitled either to Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI"). The Commissioner's deadline to file a response to the motion to reverse/remand has not yet passed, but the Court determines there is no need for additional briefing.[2] Having considered the Verhest's motion and accompanying memorandum, exhibits attached to the motion, the administrative record

---

[1]Within fourteen (14) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

[2]Generally, the Court permits full briefing before entering a report and recommendation. However, here, the Court determines this to be the exceptional case where no additional briefing is necessary. Moreover, Plaintiff will be allowed to file objections as noted above.

["AR"],  and the applicable law, the Court recommends that Verhest's motion be denied for the reasons explained below.

## I.   PERSONAL BACKGROUND

Verhest was born on November 17, 1942, and was 65 years old at the time of the ALJ hearing in 2008. [AR 45, 312.] He served in the military from April 1, 1961 to December 1, 1967, and is a Vietnam Veteran. [AR 45, 133.] Verhest testified that he finished his high school education and obtained his G.E.D. while in the service. [AR 312.] He further stated that he received additional training in computers and other areas while in the service. [AR 313.] During at least some years of his military service, Verhest was an administrative clerk and worked at the Pentagon in Washington, D.C., where he performed administrative tasks. [AR 313.] He was a Staff Sergeant at the time of his honorable discharge. [AR  313.]

Verhest is happily married and has a grown daughter. [AR 133, 152.] After his military service, he started working with the gas company. [AR 314.] Verhest described himself as an installer of appliances and heaters and a "journeyman fitter" or pipe fitter. [AR 314.] He performed that job for about ten years and then started his own heating and air conditioning business. [AR 314.] Verhest gradually stopped his business in about 2003 when he noticed he felt sick but did not know what was wrong.  He started to draw social security at age 62.  He receives about $700-800 in social security per month.  Verhest testified his wife did not work. [AR 315.]

Verhest's earnings records indicate that while he worked many years, he did not make a significant salary.  For example, his highest earnings of $10,000 or $11,000 a year were in 1975-77, 1989-90, and 1993-94.  Most years, he averaged between $4,000 and $6,000 per year. [AR 40.] On one disability form, Verhest stated he had not had a net income in his business since 1999. [AR 47.] There are no earnings from 2000-2005.  When he was working, he averaged over 40 hours a week.

The extent of Verhests' earnings is somewhat confusing.  His attorney supplied records to the Appeals Council, wherein a social worker noted that Verhest received about $800 a month in social security, while Verhest's wife received $300 a month in social security. [Doc. 15, Ex., Mar. 31, 2008 record.][3]  That same record indicated that Verhest's wife stated they were going through bankruptcy.  She was reluctant to communicate further financial details.  The record states that there was some unreported income that was not disclosed that would further reduce Verhest's eligibility for financial help. [Id.]

Another record documents that a social worker had multiple conversations with Verhest's wife about the free medications program through which Verhest had received certain prescriptions.  The social worker stated she had advised the Verhests to apply for Medicare Part D long before Verhest turned 65, but that they did not do so.  Instead, they sought to obtain prescription drugs through the free medications program.  This record indicates that Verhest's wife "has not been up front about their TOTAL income until last Thursday when she spoke with Vicki and admitted she has an income as well and that their total income is around $1200.00 a month.  She has also told me she cuts hair with her daughter." [Doc. 15, Ex., Mar. 31, 2008 telephone message.]

## II.   **PROCEDURAL BACKGROUND**

In June 2006, Verhest applied for DIB and SSI, alleging he was disabled from May 6, 2006, due to congestive heart failure, related heart conditions, and triple bypass heart surgery. [AR 45, 53, 308A.] On August 28, 2006, Verhest received a Notice of Disapproved Claim from the SSA stating that he did not qualify for disability benefits because he had not worked long enough under Social

---

[3]The records that are described as exhibits to Verhest's motion [Doc. 15] were not before the ALJ.  While they were submitted to the Appeals Council before it issued its decision, the Appeals Council made no mention of any additional documents it reviewed.  The Court addresses these documents in response to Verhest's argument that the Appeals Council committed error by not considering new and material evidence.

Security. [AR 26.] Because Verhest did not have enough work credits to qualify for benefits, the SSA made no decision as to whether he was disabled. [AR 26.] On a form dated and signed August 9, 2006 by Verhest and his attorney Gary Martone ("Martone"), Verhest requested reconsideration, stating that he was totally disabled from performing any substantial gainful activity. [AR 32.]

On October 4, 2006, Verhest filed a request for an ALJ hearing [AR 24] and another Request for Reconsideration, stating he believed he had earned the requisite social security credits. [AR 30.] Also, on October 4, 2006, Verhest's attorney wrote a letter to the SSA requesting reconsideration of the Notice of Disapproved Claim, dated August 28, 2006.  Attached to this letter was the August 2006 Request for Reconsideration. [AR 31, 32.]

On April 12, 2007, Attorney Martone wrote the SSA, stating that on October 4, 2006, Verhest had requested reconsideration of the Notice of Disapproved Claim.  However, Martone explained that his office was informed by the SSA that no record of a reconsideration was pending. Thus, Martone stated he was resubmitting the Request for Reconsideration "based on good cause for late filing due the fact Social Security did not receive this request [for reconsideration]." [AR 29.]  Martone requested "a reconsideration to appeal from the Notice of Disapproved Claim." [AR 29.]  On April 17, 2007, Martone again wrote the SSA requesting a hearing to appeal from the Notice of Disapproved Claim.  In this letter, Martone stated that he received a call from the SSA informing him that the wrong appeal was filed and he needed to request a hearing.  Thus, Martone requested a hearing to appeal the onset date of disability from the Notice of Disapproved Claim and a protective appeal date of October 4, 2007, since that was when he first submitted the request for reconsideration to the SSA. [AR 25.]

On May 7, 2008, the ALJ held a hearing, at which both Verhest and Martone were present. [AR 309-311.] Martone informed the ALJ that Verhest filed for disability benefits in June 2006 with

an alleged onset date of early 2004.  The ALJ noted that Verhest's application forms stated the onset

date was May 2006.  Martone asserted that Verhest needed to amend the onset date and suggested

that the ALJ conduct the hearing before determining the appropriate onset date.  Martone further

explained to the ALJ that Verhest stopped working in 2003 because he felt fatigued and sluggish.

According to Martone, Verhest went to doctors in 2004 and was prescribed thyroid medication by

the Veteran's Administration medical system.  The administrative record contains no medical

records from the VA.

In May 2006, Verhest was diagnosed with congestive heart failure and multiple heart

conditions.  He underwent heart surgery that month.  Martone asserted that this explained Verhest's

proposed onset date of May 2006.  Martone argued at the hearing that there was substantial medical

evidence to show Verhest's heart problems occurred as early as 2003, when he stopped working.

[AR 312.]

After reviewing the medical records and testimony, the ALJ found that there was no

objective medical evidence to show an onset date of disability before May 2006. [AR 319.] The ALJ

allowed Verhest thirty days to provide additional medical records. [AR 322-23.]

On September 24, 2008, the ALJ issued a decision denying Verhest's applications for

disability benefits. [AR 10.] The ALJ noted, in part, that Verhest's request for SSI was denied on

the basis of his unearned income, in the form of social security retirement pay.  Verhest was still

receiving benefits and was ineligible for SSI due to his income. With respect to the request for DIB,

the ALJ noted that social security records indicated Verhest met the special insured status

requirements through December 2004, but not after that date.  Because he did not establish a

disability before December 31, 2004, the date his insured status lapsed, he was not entitled to DIB.

[AR 11.]

On November 26, 2008, Martone requested review of the decision. [AR 5, 6.] On June 5, 2009, the Appeals Council denied the request for review, indicating that Verhest did not specify any errors in the ALJ findings. The Appeals Council further observed that Verhest's last date of insured status expired December 31, 2004, before the alleged onset date of disability. He was not eligible to receive DIB, and he also could not receive SSI if his unearned income from social security retirement benefits exceeded designated income levels. The Appeals Council noted that Verhest currently received retirement benefit payments and, therefore, was not eligible for SSI. [AR 2-3.] The Appeals Council's decision did not indicate that it reviewed any additional materials or medical records.

## III.   STANDARD OF REVIEW

The Court does not summarize the five-step sequential evaluation utilized to determine disability because the ALJ denied Verhest's grounds on other grounds.

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004). The Court's review of the Commissioner's determination is limited. Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992). The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence. Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991). Grounds for reversal also exist if the agency fails

to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

In this case, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

## IV.    **MEDICAL HISTORY**

Verhest provided a few older medical records between the years 1989 and 1996.  None of them appear relevant with respect to his applications for disability benefits and none indicate any history of heart problems. [AR 61-78.] Indeed, in 1995, Verhest checked off a form, noting that he had no health problems, including no trouble with his heart. [AR 79.]

### *2003-2005 Medical Records*

In 2003, the year when Verhest testified that he began feeling fatigued and unwell and unable to work,[4] there is a single medical record, dated November 12, 2003.  He saw Dr. Rogers for an evaluation of myalgias, arthralgias and a cough that had last two days.  He complained of some pain in the mid-portion of his back.  Verhest's wife was with him, and she stated she was worried he had heart disease.  Dr. Rogers found his cardiac exam to be normal and believed Verhest suffered from a muscle strain.  He doubted that there was any indication of an aneurysm, myocardial infarction, or angina pectoris.  Dr. Rogers stated that if the pain continued, he would order studies.  [AR 70-71.] No record confirms that Verhest saw Dr. Rogers or any other physician about the pain again, nor is there record verification that additional studies were ordered in 2003 or 2004.

---

[4]While Verhest testified that he stopped working in 2003 or 2004, there are no earnings from 2000-2005.

Verhest or his attorney sought to amend his disability onset date from 2006 to 2003 or 2004. There are no medical records from 2004 and no objective evidence that Verhest sought medical care then.  There is a single medical record from 2005, when Verhest saw a medical care provider on December 20th for a fever and myalgias, but the problems had resolved by the time of his appointment. [AR 304.]

### *2006 Medical Records*

On January 18, 2006, Verhest had the flu, although he stated he felt well.  He denied any family history of heart disease or hypertension ("HTN").  He did not exercise regularly but described himself as very active. [AR 302.]

On March 23, 2006, Verhest was seen for a cough.  He was better and had no complaints of shortness of breath. [AR 300.] On March 24, 2006, he complained of hearing loss and an accumulation of ear wax. [AR 293, 296.]

On May 1, 2006, Verhest was seen by Dr. Lemon.  He described feeling some "anxiety breathing" that was happening every day.  He had started doing army style sit-ups after a weight gain and he felt more breathless.  He was under a lot of stress but had trouble opening up and talking to people.  He reported no history of HTN, diabetes or heart disease.  He suffered from some irregular heartbeats from time to time and palpitations.  He had dyspnea on exertion, which might be a stress reaction that led to palpitations.  Dr. Lemon scheduled a stress test and a Holter monitor. Verhest asked for short-term help with anxiety and was prescribed an anti-anxiety medication. [AR 288.]

About a week later, Verhest went to UNMH's Emergency Room with complaints of shortness of breath. [AR 255.] He reported the shortness of breath had occurred for about two weeks and usually came on with exertion.  He had no chest pain, and the shortness of breath usually

resolved within a few minutes with rest.  Verhest was admitted to the hospital after initial testing.

He was sent directly to the cardiac catheterization laboratory for further evaluation of cardiac risk.

[AR 256.]

On May 15, 2006, Verhest underwent extensive heart surgery.  He was diagnosed with

severe mitral regurgitation, coronary artery disease, and severe left ventricle dysfunction with an

ejection fraction of approximately 15%. [AR 227-28.] The operation consisted of a coronary artery

bypass graft times one, left internal mammary artery to the left anterior descending artery, and a

mitral valve repair.  The medical notes indicate Verhest had a past history of hypothyroidism,

hemorrhoid banding procedure and an appendectomy at age 16. [AR 155.]

On May 27, 2006, Verhest was discharged.  At that time, he was taking Aspirin, Coreg (heart

medication), Synthroid (thyroid medication), Lasix, Potassium chloride, Fosinopril, Lipitor,

Augmentin (antibiotic), and Roxicet (for pain). [AR 156.]

On May 31, 2006, Verhest was seen at the Congestive Heart Failure Clinic by Dr. Vos and

Dr. Anderson.  His wife and daughter were with him.  All were very concerned with the family's

financial situation.  Verhest reported he had not been assigned a social worker yet so as to discuss

disability.  The Verhests stated they had filed for bankruptcy regarding Verhest's business.  Verhest

wanted to apply for disability as a result of his medical condition. [AR 152.]  Physically, Verhest

was doing well.  He denied chest pain or dizziness.  He suffered some discomfort with the

defibrillator.  He was walking daily and feeling very well.  The doctors described him as being a

self-employed businessman, whose business involved heating and air conditioning repair and

installation.    On June 1, 2006, Verhest was seen by a nurse practitioner in the Division of Thoracic

and Cardiovascular Surgery.  This was his first post-op visit.  He complained of tiredness but

otherwise was feeling well.  He tolerated the increased activity level well. [AR 146.] On June 1,

9

2006, the radiology report indicated a battery pack was implanted in Verhest's left chest with two lead pacemaker wires.  There was also evidence of mitral valve replacement.  His pneumonia was improving. [AR 150.]

Also on June 1, 2006, a UNMH Disability Information Form was filled out, stating that Verhest was diagnosed with congestive heart failure and coronary artery disease.  He had ischemic cardiomyopathy with an ejection fraction post bypass surgery of 15% (normal is 60%).  He needed frequent follow-up medical appointments for the next year. [AR 306.]

On June 21, 2006, Dr. Vos and Dr. Anderson noted that Verhest was doing well and had no specific complaints. [AR 141.]

During June 2006, Verhest filed his applications for DIB and SSI. [AR 45, 308A.] He claimed an onset date of May 6, 2006.

Verhest continued with follow-up medical appointments in 2006.  He was improving and feeling well.  He was able to walk daily without fatigue.  Financial concerns were still an issue. Since the heart surgery, he felt he no longer could do the strenuous work he had done previously. His medical conditions, however, were stable. [AR 136.

In an undated letter from Dr. Anderson and Dr. Vos addressed "to whom it may concern," the physicians stated that Verhest suffered a major heart attack in May 2006 and subsequently had a major impairment in his heart's ability to pump, resulting in congestive heart failure.  The doctors described congestive heart failure as a syndrome that was debilitating and life threatening, without a cure.  As a result of his cardiovascular condition, the doctors opined that Verhest could no longer work, which had resulted in the loss of his small business.  The Verhests had to file for bankruptcy in order to save their house.  This letter states that all of these issues caused stress for Verhest, which

impeded his recovery.  The doctors asked that the reader be "gracious when considering the bankruptcy case." [AR 307.]

On August 1, 2006, there is a medical note documenting a telephone call from Verhest's wife.  She wanted to know where to apply for food stamps.  He had applied for disability benefits but had been denied due to failure to work enough quarters. [AR 135.]

On August 9, 2006, Verhest filled out a disability report-appeal.  He noted he was recovering from triple bypass surgery, chest limitations, lifting limitations, itchiness and burning around his chest, a thyroid condition, high blood pressure, and high cholesterol – since May 2006.  Since that date, Verhest felt anxiety, frustration, depression and stress. [AR 53.]

Also on August 9, 2006, Verhest filed a request for reconsideration as to the social security denial of this request. [AR 32.]

On August 11, 2006, Verhest had an appointment with Dr. Comerci to establish care with a primary care physician.  Dr. Comerci noted his recent medical history of coronary artery disease, status post mitral valve repair, and status post ICD (defibrillator) placement.  Dr. Comerci wrote that Verhest evidently had been in excellent health prior to the surgery.  He began feeling quite ill with exertional epigastric pain in May 2006.  He suffered intermittent shortness of breath and significant dyspnea on exertion which prompted him to go to the ER in May.  Dr. Comerci noted that Verhest was classified as a "New York Heart Association Class I."[5]  On this date, Verhest was feeling fine.  His last exam at the Congestive Heart Failure clinic was excellent.  He was trying to walk daily.  He

---

[5]"New York Heart Association (NYHA) Functional Classification provides a simple way of classifying the extent of heart failure. It places patients in one of four categories based on how much they are limited during physical activity; the limitations/symptoms are in regards to normal breathing and varying degrees in shortness of breath and or angina pain . . . ." www.wikepedia.com  An individual classified as NYHA Class I is described as having no symptoms and no limitation in ordinary physical activity, e.g. shortness of breath when walking, climbing stairs etc.  Id.

denied palpitations and there was nothing to suggest discharge of his defibrillator. He was optimistic, and not depressed. [AR 132-34.]

The written notice of the disapproved claim for benefits was dated August 28, 2006. [AR 26.] As stated previously, Verhest's attorney sought reconsideration of the disapproved claim. [AR 24, 30, 31.]

In October 2006, Verhest was seen by Dr. Comerci again. Verhest was doing "remarkably well." Dr. Comerci noted he had written a letter to Verhest's bankruptcy attorney because of Dr. Comerci's concerns that Verhest not be excessively stressed. [AR 126.]

In a November 2006 letter to Dr. Voss from Dr. Comerci, Verhest was described as doing "fantastically." His platelet count had dropped though, although it was stable. [AR 115.] On November 15, 2006, Dr. Taylor saw Verhest, who was feeling very well. He was having financial concerns and wanted documentation that might help him with his disability request. [AR 108.] In December 2006, Verhest was described as feeling very well with no current complaints, other than financial concerns. [AR 106.]

### *2007 Medical Records*

On January 8, 2007, Verhest had an appointment with Dr. Comerci. All was well, except he had a persistently low platelet count (thrombocytopenia). [AR 104.] The etiology was unclear, but the most likely culprit was the ACE inhibitor. He needed a hematology referral. [AR 103.]

In April 2007, Dr. Comerci again saw Verhest, who was "absolutely asymptomatic." He was active at home and able to play with his grandkids. His heart condition was stable. [AR 95.] On May 9, 2007, Dr. Taylor saw Verhest, who had no complaints about his cardiac condition. He was doing very well and keeping active. He could perform all daily living activities without impediment, but he made sure not to over-exert himself. [AR 93-94.]

In August 2007, Verhest had a routine check up.  Verhest was finally getting accustomed to the discomfort of the defibrillator.  "He looked great." [AR 85-86.]

There are several other medical records from late 2007 that were not part of the administrative record and apparently not reviewed by the Appeals Council.  They were submitted to the Appeals Council, but the Appeals Council made no mention of them in its review.  Instead, counsel attached these records as exhibits to his opening motion. [Doc. 15.] The Court summarizes these records here to support its recommendation that even if it was error by the Appeals Council not to have reviewed these records, it was harmless error.  These records are identified as exhibits to Document 15.

On October 18, 2007, Verhest was seen due to concerns about his defibrillator.  The manufacturer of his "defibrillator lead" provided notice that the device was found to be "under advisory."  Even though Verhest had been feeling very well, he wanted to discuss potential problems with the defibrillator.  The clinic performed an "interrogation" of the device.  It appeared to be functioning normally. [Doc. 15, Ex. 10/18/07 Medical Record.]

On October 26, 2007, Verhest saw Dr. Comerci about the defibrillator.  Verhest was not having physical problems, but he received notice that he was in a high risk group regarding a possible defibrillator malfunction and was nervous about it.  The doctor's note indicates Verhest had stood up very quickly several days ago and had fallen to the ground without passing out.  Verhest intended to carefully follow doctor's orders regarding getting up more slowly. [Doc. 15, Ex. 10/26/07 Medical Record.]

On November 12, 2007, Verhest saw a physician for hemorrhoid problems.  His energy level was excellent and he had no heart problems. [Doc. 15, Ex. 11/12/07 Medical Record.]

### *2008 Medical Records*

On January 7, 2008, Dr. Comerci saw Verhest for a routine follow-up.  Verhest's wife was extremely upset and worried about the defibrillator and believed he had a "time bomb" in his chest. While Verhest and his wife expressed concerns about the medical equipment, no complaints or concerns were raised about his heart or his general condition.  Indeed, Dr. Comerci noted that Verhest felt great and found, from a cardiac standpoint, that Verhest was stable.  However, his family was "confused and terrified," but these concerns focused on the defibrillator.  Dr. Comerci thought it might be therapeutic if the family saw Dr. Ramo, who had agreed to speak to them. [Doc. 15, Exs. 1/7/08 Medical Records and Referral.]

On January 17, 2008, Verhest was seen by a nurse practitioner at the Congestive Heart Failure Clinic.  His daughter and wife accompanied him.  They were still worried about the defibrillator and potential problems.  The nurse practitioner noted that Dr. Ramo had evaluated the device recently and it was working well. [Doc. 15, Ex. Jan. 17, 2008 Medical Record.]

On February 5, 2008, Verhest complained of a runny nose and generalized fatigue for one week.  The condition started with a sore throat but that had resolved.  He felt no chest pain and did not appear to be in any cardiopulmonary distress.  Verhest had an upper respiratory tract infection/viral infection. [Doc. 15, Ex. Feb. 5, 2008 Medical Record.]

On March 10, 2008, Verhest continued to do very well.  "I feel great." [Doc. 15, Ex. March 10, 2008 Medical Record.] On March 20, 2008, Verhest's defibrillator was tested and was all right. Verhest was doing quite well. [Doc. 15, Ex. Mar. 20, 2008 Medical Record.]

There is a March 27, 2008 record by case management medical department personnel. Verhest's wife had been referred to this department by a nurse to help explain to Mrs. Verhest the Medicare D changes for prescription medications.  Mrs. Verhest spoke of having to file for

bankruptcy.  There were problems in explaining Medicare D to Mrs. Verhest. [Doc. 15, Ex. Mar. 27, 2008 Case Management Record.]

On March 31, 2008, Mrs. Verhest saw a social worker about the same issues.  She wanted to continue to get one of her husband's heart medications (Coreg) free but had been told he was not eligible since Verhest now was eligible for Medicare benefits, part D.  Later, Mrs. Verhest called the social worker to say she had worked out the problems and no longer needed help. [Doc. 15, Ex. Mar. 31, 2008 Social Worker Record.]

On March 31, 2008, there is documentation of telephone conversations with Mrs. Verhest about the free medications program.  This social worker stated she had advised the Verhests to apply for Medicare Part D long before he turned 65 but they had not done so.  Instead, Mrs. Verhest wanted to avoid Medicare Part D and obtain the medications through the free medications program. This employee tried to explain to Mrs. Verhest why her husband was no longer eligible but Mrs. Verhest did not accept the explanation.  The social worker did not believe Mrs. Verhest had been forthright about the family's finances. [Doc. 15, Ex. Mar. 31, 2008 Telephone Record.]

On May 7, 2008, the ALJ held the administrative hearing.  As stated above, the ALJ was concerned with the date of last insured ("DLI") (December 31, 2004) and Verhest's alleged onset date of May 2006, well after the DLI.  Verhest attempted to bolster the lack of any objective medical evidence from 2003-2004 by stating he was feeling fatigue and sluggish in that time frame.  His attorney claimed there was substantial medical evidence to show Verhest suffered from heart-related problems since 2003.  Verhest admitted he had not been diagnosed with heart disease before 2006, but stated he had gone to doctors before then who thought his problem was anxiety. [AR 316-37.] The ALJ asked Verhest why medical records from January 2006 documented his denial of any chest pain or shortness of breath, if he was having those problems as early as 2003-04. [AR 317.] Verhest

15

stated maybe he was "just a little bit stronger at the time that [he] didn't know [he had heart problems] or maybe it was the ignorance or whatever it was, but–" [AR 318].

Ultimately, the ALJ found no objective medical evidence to support an earlier onset date. She stated that while Verhest may testify otherwise, no objective medical evidence existed to support his testimony. [AR 319.] Martone stated that he had gone over the medical history with the Verhests and that the record was complete. [AR 320.] The ALJ advised that Verhest could withdraw the request for a hearing.  Martone asked if it would be possible or of benefit to have a doctor look at the file.  The ALJ responded: "No." [AR 321.] "I can't even have a doctor give me a magic ball where they can see in the past and say with medical certainty and probability that that was going on . . . because it doesn't matter.  It doesn't matter until the day he was actually diagnosed and treated. We can't deal with supposition." [AR 321.  Martone wished to proceed to a written decision "to give [him] additional time to see if [he] could figure out something else." [AR 321-22.] The ALJ noted that if she issued a written decision that absolutely denied the applications, Verhest would be "stuck with that." [AR 322.] Martone then asked that he be given 30 days to search for additional records. [AR 322.] The ALJ granted that request and the hearing adjourned. [AR 323.] Verhest did not supply any additional records to the ALJ, after the hearing.

Interestingly, there is a letter dated June 26, 2008, written by Dr. Comerci to Martone, but this letter was not provided to the ALJ before she issued her decision on September 24, 2008.  The June 26, 2008 letter was provided to the Appeals Council, but they apparently did not review it.  The letter will be discussed below.

On September 24, 2008, the ALJ issued an opinion denying Verhest's requests for DIB or SSI, for the reasons explained *supra*.  Verhest was not eligible for DIB or SSI, and the onset date of May 2006 was not amended. [AR 10-12.] Prior to the lapse of his insured status at the end of

16

December 2004, Verhest did not have any medically determinable condition that had a significant effect on his ability to perform basic work activities and that could be considered "severe." [AR 11.] Thus, he was not under a disability as defined by the Social Security Act and regulations at a time when he had insured status.

## V.      **DISCUSSION**

Verhest argues that the Court should reverse or remand this matter because of errors by the Appeals Council.  More specifically, Verhest contends that the Appeals Council failed to properly review the ALJ's decision and the evidence with respect to the onset date of disability and failed to consider "new and material" evidence Martone provided to the Appeals Council in February 2009. Verhest also argues that the ALJ's refusal to call a medical expert was contrary to law. [Doc. 15.]

Martone demonstrates that he sent additional medical records to the Appeals Council on February 2, 2009, and that the Appeals Council received them on February 5, 2009. [Doc. 15, Ex. B, U.S. Postal Receipts.] The Appeals Council did not issue its decision until June 5, 2009, and therefore, would have received the additional records before that date.  However, the Appeals Council's decision makes no mention that additional medical records were submitted or reviewed. [AR 2.]

### A.      *Onset Date of Disability*

Verhest argues first that the Appeals Council committed error because it "apparently failed to audit the hearing transcript," which showed that Verhest "amended his alleged onset date to prior to the date last insured . . . ."  Thus, according to Verhest, the Appeals Council's failure to review all of the evidence constituted a violation of his due process rights.

It is difficult to understand how Verhest can argue that the ALJ hearing transcript demonstrates he amended his onset date to a date prior to the DLI.  It is true that in his opening

statement at the hearing, Martone attempted to make this argument.  "In this case, [Verhest] had filed for Disability Benefits in June of '06, with an alleged onset date of early '04.  I can't, I don't recall the exact date, but his date last insured is December of '04 and he'll–" [AR 311.] The ALJ immediately set counsel straight.  "The onset, his alleged onset date was 5/6 of '06." [AR 311.] Then, Martone argued that Verhest needed to amend that date but he suggested the ALJ take testimony first and that they "try to figure out the appropriate [onset] date." [AR 311.]

After hearing testimony from Verhest, the ALJ stated: "There's no objective medical evidence to support an onset date of anything prior to 5/6 of '06 because all the testimony that you might give me of how you felt back in 2003 has to be supported by objective medical evidence, okay?" [AR 318.] Even Martone admitted that "[t]here really is no medical evidence regarding the heart until May of '06." [AR 320.] Thus, even if it were true that the Appeals Council failed to read the ALJ hearing transcript, nothing in that transcript supports Martone's contention that the onset date was amended.

The Court concludes that substantial evidence supports the ALJ's finding that Verhest's onset date was May 2006, and that no error was committed by either the ALJ or the Appeals Council as to the determination of onset date.  Therefore, the Court recommends finding that the Appeals Council did not commit reversible error.

### B.    New and Material Evidence

Verhest argues that the Appeals Council's apparent failure to review the medical records submitted to it in February 2009 was substantial legal error necessitating a remand for further proceedings.  In so arguing, Verhest sets out the social security regulation defining "new and material evidence." [Doc. 15, p. 5.] For example, the Appeals Council is required to consider

additional evidence "only where it relates to the period on or before the date of the ALJ hearing decision."  20 C.F.R. § 404.970(b).

For new and material evidence to warrant a remand, the claimant must show that "the new evidence would have changed the Secretary's decision had it been before him."  Hargis, 945 F.2d at 1493.  Implicit in this materiality requirement is that the proffered evidence relate to the time period for which the benefits were denied.  Id.  New evidence is not considered if it relates to a "later-acquired disability" or "the subsequent deterioration of the previously nondisabling condition."  See Beauclair v. Barnhart, 453 F. Supp. 2d 1259, 1269 (D. Kan. 1996) (internal citation omitted)

To summarize the requirements, the evidence must be "new" and not merely cumulative; it must be material; i.e., relating to the time period when benefits were denied; it must offer a reasonable possibility of changing the Secretary's decision; and the claimant must show good cause for the failure to obtain and present the evidence at the prior hearing.  Id. (internal citations omitted).

Although Martone submitted a number of 2007, 2008, and 2009 medical records [Doc. 15, Exhibits], none of those medical records support a finding of a different onset date or that Verhest suffered from heart problems before 2006.  For the most part, those medical records document routine follow-up visits and are irrelevant to the issue of disability at an earlier date, or they are simply cumulative.  For example, a number of the records concern Verhest's worries over a manufacturer warning regarding his defibrillator, even though Verhest did not have problems with his defibrillator.  Other medical records concern Verhest's hemorrhoid problems and complaints of a cold and fatigue.  Another set of records document social workers' frustrations with Verhest's wife and their feelings that she was not being forthright about the family's income.

The only records relied upon by Verhest in support of his motion for remand include three brief unnotarized statements: that of Verhest, Verhest's daughter, and a friend. [Doc. 15, Exhibits.] Verhest states that his cardiologist told him his heart problems had been going on for "quite a while" and that looking back, Verhest believed his heart problems started affecting him in 2003.  No record from the cardiologist confirms this hearsay statement.  Verhest's daughter stated that her father became a very different person in 2004.  Before 2004, he was extremely energetic, but as of 2004, he became sluggish and tired, and his skin color was bad.  His daughter stated she knew something was wrong.  Finally, the friend states she first met Verhest in 2003 and noticed in 2004 that he did not look well.  The friend supposedly asked Verhest's wife if Verhest had gone to see a heart doctor. The friend could tell that Verhest "definitely [was] not well in 2004."

None of these statements constitute objective medical evidence that demonstrate an earlier onset date.  They are speculative at best and cannot serve as the basis of objective medical evidence. If the Appeals Council failed to review these statements, any error was harmless.

One document remains that is relied upon by Verhest – the June 26, 2008 letter to Martone from Verhest's primary care physician, Dr. Comerci.  There is no explanation why this letter was not provided to the ALJ.  She did not issue her written opinion until September 2008.

However, it makes little difference whether the ALJ or the Appeals Council reviewed this letter.  In the June 26, 2008 letter, Dr. Comerci notes that he was responding to a June 12, 2008 letter from Attorney Martone concerning Verhest's disability.   Dr. Comerci summarized Verhest's medical problems and the heart surgery.

In addition, with respect to onset date, he stated:

> Regarding the exact onset of Mr. Verhest's disability, this is not
> entirely clear.  Certainly it is clear that he has been disabled since the
> May 2006 hospital admission.  Given what was discovered regarding

> his ejection fraction (This is the measure of the ability of the heart to pump blood), it is conceivable that he had been ill for some time prior to that. . . .
>
> Mr. Verhest feels that he has been unable to work since January 1, 2004. It is conceivable that he developed heart failure at that time, but this is only conjecture. Given the fact that he has had no medical encounters until this recent encounter, it is extremely difficult to objectively determine when indeed he became disabled, other than the fact that he clearly was noted to be disabled at the time of his hospitalization. As I mentioned, it is conceivable that his heart failure started to become clinically significant in 2004 and this caused him to have lack of strength and vigor. Unfortunately, the exact time cannot be determined.

In Martone's February 2, 2009 cover letter to the Appeals Council, he stated that Dr. Comerci's "letter is a retrospective expert medical opinion from a treating physician which relates back to the time period prior to the DLI." [Doc. 15, Ex.] "Based on Dr. Comerci's opinion, there is substantial evidence of a disability prior to the DLI . . . ." [Id.]

Dr. Comerci's letter could not be clearer. All he could do was provide conjecture as to the onset date of Verhest's heart problems. While he noted that the condition "conceivably" could have started in 2004, he expressly conceded this was "only conjecture." Dr. Comerci noted that Verhest's subjective complaints of fatigue, loss of energy, shortness of breath and sluggishness in 2004 were "quite consistent" with a diagnosis of heart failure, but Dr. Comerci's 2008 letter does not come close to the objective medical evidence required by law to support an onset date of 2004. Dr. Comerci stated it was "extremely difficult" without medical records to objectively determine the onset date and that the exact date could not be ascertained.

Notwithstanding an attorney's obligation of zealous advocacy, argument must be supported by record evidence. Martone's assertion that "[b]ased on Dr. Comerci's [June 26, 2008] opinion, there is substantial evidence of a disability prior to the DLI. . . " is simply not so supported. The

June 26, 2008 letter from Dr. Comerci does not constitute "new and material" evidence.  It is only tangentially related to the time period when benefits were denied and it offers no reasonable possibility of changing the Secretary's decision.  Moreover, Verhest did not show good cause for his failure to obtain and present the evidence at the ALJ hearing or to the ALJ.  Martone did not request the letter until apparently June 12, 2008, a little over the thirty-day time frame he sought and obtained from the ALJ to submit additional materials.

The Court finds no error in the Appeal's Council's failure to review this letter or any of the above-mentioned evidence.  To the extent it was an error, the error was harmless.

### C.    ALJ's Refusal to Contact Medical Expert

Verhest also argues that the ALJ's failure to call a medical expert was contrary to law.  At the hearing, Martone wondered if the ALJ might find it helpful to call a medical expert.  The ALJ refused stating that it would be nothing more than supposition, which is exactly what Dr. Comerci's June 2008 letter confirms.[6]

In support of his position, Verhest contends that S.S.R. 83-20 required the ALJ to call a medical expert to help determine the onset date of disability in this case.  S.S.R. 83-20 states, in part:

> [i]n some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. . . . At the hearing, the . . . ALJ should call on the services of a medical advisor when onset must be inferred. . . .

S.S.R. 83-20 is "binding on all components of the Social Security Administration," including ALJs. Blea v. Barnhart, 466 F.3d 903, 909  (10th Cir. 2006).  For disabilities of non-traumatic origin, "the

---

[6]Dr. Comerci's letter is not part of the record.  It is discussed here because Verhest's attorney relies on it as part of his substantial evidence argument.

determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." Id. (*quoting* S.S.R. 83-20).

> The date alleged by the claimant is the starting point for determining disability onset, and the date the claimant stopped working is also of significance in selecting the onset date. Medical evidence, however, is the "primary element" for the onset determination, as the onset date "can never be inconsistent with the medical evidence of record."

Id. (internal citations omitted). "[A] medical advisor need be called only if the medical evidence of onset is ambiguous." Reid v. Chater, 71 F.3d 372, 374 (10th Cir. 1995). "If the medical evidence is ambiguous and a retroactive inference is necessary, SSR 83-20 requires the ALJ to call upon the services of a medical advisor to insure that the determination of onset is based upon a 'legitimate medical basis.'" Blea, 466 F.3d at 911. An ALJ, however, is not required to call a medical advisor "in every case where the onset of disability must be inferred. As stated before, the ALJ must consult a medical advisor only if the medical evidence is ambiguous. Lawson v. Chater, 74 F.3d 1249 (Table, Text in Westlaw), 1996 WL 21260, at *2 (10th Cir. Jan. 19, 1996) (internal citations omitted).

Here, the Court concludes that the medical evidence was not ambiguous, and therefore, that the ALJ did not need to consult a medical advisor. *See* Bigpond v. Astrue, 280 F. App'x 716, 719 (10th Cir. May 30, 2008) (ALJ did not err in failing to consult with a medical advisor regarding the onset date of claimant's cardiac disability where evidence was not ambiguous). Verhest had doctor's appointments as far back as 1989. None of the earlier records indicate complaints related to his heart. The medical records five months before his surgery in 2006 indicate that Verhest did not have complaints about his heart. In addition, Verhest's initial inclination was to state an onset date of May 2006, when he was diagnosed with heart conditions and underwent surgery. That onset

date is clearly consistent with the medical records.  Dr. Comerci, Verhest's PCP, candidly admits that it is nothing more than speculation or conjecture that Verhest had an earlier onset date.

Moreover, Verhest's work history or last date he worked does not compel a different conclusion.  Although Verhest states he stopped working in 2003 or 2004, when he first started to feel more tired and sluggish, the earnings records show no income starting in 2000.  Thus, it appears possible that Verhest stopped working well before 2003.

As stated above, the primary consideration of onset date is the objective medical evidence. In this case, that evidence supports an onset date of May 2006.  This is not a case where the ALJ needed to infer the onset date, nor is it a case where the medical evidence was ambiguous. Therefore, the Court finds no error by the ALJ in her failure to consult a medical advisor.

## VI.   **RECOMMENDATION**

For all of the above-stated reasons, the Court recommends that Verhest's Motion to Reverse and Remand be DENIED and that this matter be DISMISSED, with prejudice.


*Lorenzo F. Garcia*
Lorenzo F. Garcia
United States Magistrate Judge

24